

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 37274-0-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JAMES WILLIAM COOK, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A prosecutor functions as the representative of the people, including defendants, in a search for justice. A prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial are not violated. When the cumulative effect of repeated serious prosecutorial misconduct prejudicially affects a defendant's constitutional right to a fair trial, an appellate court must reverse the tainted convictions and remand for a new trial.

Here, James Cook appeals his convictions for two counts of child molestation in the first degree against A.J.M.,[1] a step-granddaughter, and three counts of child

---

[1] To protect the privacy interests of the child victims, we use their initials throughout this opinion. Gen. Order 2012-1 of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

molestation in the second degree against E.M.M., also a step-granddaughter.  Because of the cumulative effect of repetitive and at times serious prosecutorial misconduct, we reverse and remand for a new trial.

FACTS

In 2016, Cook married his current wife, Carol.  The two lived on 45 acres in a remote community in Douglas County known as the Palisades.

Carol has two children, Jim and Melissa.  Jim's family includes a daughter, A.J.M., and her sister and brother.  Melissa's family includes a daughter E.M.M., and her two sisters.

In April 2018, Melissa and her three daughters traveled to Ocean Shores to visit her mother and Cook.  One evening after dinner, the girls asked to be excused while Cook was talking.  Melissa excused them.  Cook threw down his silverware and said he felt disrespected and accused Melissa of being a bad mother for not teaching her children to respect their elders.  Cook's reaction upset Melissa and her children and they left the table.

Melissa later found E.M.M. in a room crying.  E.M.M. told her mother that Cook had once touched her leg and it made her feel uncomfortable.  Melissa left early the next morning with her daughters.

2

In September 2018, Jim took A.J.M. and her brother to visit Carol and Cook at their rural property. A.J.M. was nine years old at the time. After dinner, A.J.M. told her brother that Cook had touched her around her private areas and up her shirt while they were driving the tractor. After they returned home, A.J.M. made similar comments to her sister and mother, who called the police. A.J.M. then told her older cousin, E.M.M., who then told her mother that the same thing had happened to her.

Detective Tim Scott investigated the girls' accusations. The girls were also interviewed by a forensic child examiner.

After the investigation, the State charged Cook with two counts of child molestation in the first degree with respect to A.J.M. and three counts of child molestation in the second degree with respect to E.M.M. The trial focused on discrepancies between the various accounts given by the two girls.

*A.J.M.'s various statements*

In her first statement, A.J.M. told her brother after dinner that the incident had occurred hours earlier on the tractor. During a forensic interview, A.J.M. said that two separate incidents occurred while riding the tractor, once during the day and once at night. But when she testified, she contradicted what she told the forensic interviewer and

insisted that only a single incident occurred at night and that she had told her brother immediately after it happened.

*E.M.M.'s testimony*

E.M.M., who had told her mother in April 2018 that Cook once touched her leg, testified that Cook molested her three times in 2017. The first time occurred in September 2017, when she was 13 years old. She testified she had complained about her back and Cook told her to come up to the couch where he was sitting. She said that Cook then touched her leg and moved up to her vagina, making circular motions. After five minutes, she said she wanted to go to bed. She explained she did not tell anyone because she was afraid that Cook might hurt her.

The second time occurred a couple of months later, in November. She was playing X-box, and Cook came out of the kitchen, sat behind her in a chair, and began to rub her breasts. She explained she tried to get Cook to stop by scooting forward while playing X-box, but both times she moved forward, he pulled her back. This lasted three to five minutes.

The third time occurred a couple of weeks later. She told Cook she was excited about learning to drive. Cook said he would let her drive his truck down the driveway and on the dirt road. He directed her to sit on his lap, even though she was able to reach

the pedals.  As she drove, Cook began to rub her breasts.  When he would not stop, she

stopped the truck, got out, and moved to the passenger side.  Defense counsel cross-

examined E.M.M. using a prior statement she had given.  The questioning showed that

her testimony was inconsistent in various respects to her prior statement.

*Detective Tim Scott*

The State questioned Detective Tim Scott about how he lets the prosecutor's office

know if he does not believe someone who reports a crime:

> [STATE:]  Detective, when you send up a report for review, do you send it up if you don't think that the reporters are credible?  Do you have any discretion about whether or not you send a report to be charged?
> [DETECTIVE SCOTT:]  No, no[t] all of our reports go to the prosecutor's office.
> [STATE:]  Okay.  Do you send up a recommendation with reports that you think are being done by people that are not credible?
> [DEFENSE]:  Objection, he's commenting on the evidence.
> THE COURT:  I'm gonna allow this question.
> [DETECTIVE SCOTT:]  I'm sorry, could you ask it again?  I didn't understand it.
> [STATE:]  If you don't think that the reporter is credible, do you have any way of telling the prosecutor that?
> [DETECTIVE SCOTT:]  Yes.
> [STATE:]  Doesn't go in your report or does it?
> [DETECTIVE SCOTT:]  No, it would go in my report. . . .  I would [also] have probably a verbal conversation with the prosecutor letting him know that on multiple levels I believed a person was lying to me.  I've don[e] that many times.
> [STATE:]  Did you do that in this case?
> [DETECTIVE SCOTT:]  No.

> [DEFENSE]: Same objection, Your Honor, he's just indicated that everybody he talked to is credible. That's objectionable. He's commenting on their testimony.
>
> [STATE]: Your Honor, he's a twenty-five year law enforcement officer who is not only a detective but is a detective sergeant with hundreds of experiences. He has the ability to give an opinion.
>
> THE COURT: I think we just need to move to the next line of questioning.

Report of Proceedings (RP) at 116-17.

The State also asked Detective Scott whether Cook said anything after being arrested. Detective Scott responded, "No. He said he wanted an attorney. Did not make any statements." RP at 117-18. Defense counsel did not object to the question or answer.

*Child forensic examiner Isabel Bedolla*

The State also questioned child forensic examiner, Isabel Bedolla. The State asked about her interview process. She told the jury that the process she uses has been researched extensively and had been shown to produce truthful and accurate information. She explained that her process involves going back and asking clarifying questions when there is a discrepancy in the interview. She testified that if a child discloses abuse, she believes the child. Defense counsel did not object to this testimony.

*Defense testimonies*

Carol testified that the area where Cook and A.J.M. rode the tractor was visible to everyone and people would have been able to see if any inappropriate touching had occurred.

Cook testified that before marrying Carol, he had raised two children and stepchildren and had no criminal history. He denied touching A.J.M. and E.M.M. inappropriately. The State's cross-examination of Cook included the following exchange:

> [STATE:] Mr. Cook, we haven't had a chance to meet. . . . I represent the State. We've accused you of these five crimes. Why are they lying about this?
>> [DEFENSE]: Objection, asks for commenting on witness's testimony.
>> [STATE]: I'm sorry, I can't even understand what that objection means, Your Honor. Of course I get to ask him that question.
>> THE COURT: I'm gonna allow it.
> [COOK:] Would you repeat the question please?
> [STATE:] Why are these children lying about this?
> [COOK:] I don't know.
> [STATE]: You don't know?
> [COOK:] No.
> [STATE]: You can't—you can't think of a motive?
> [COOK:] I don't know what's in their head.[2]

RP at 431-32.

7

The State also asked Cook about his opportunity to speak with police after his

arrest:

> [STATE:]  And then they followed up with a phone call the next day to make an appointment for you to come see them and talk to them at the station, correct?
> [COOK:]  Correct.
> [STATE:]  And you didn't go to that appointment, correct?
> [COOK:]  I believe I was arrested [before the] call was made. . . .
> [STATE:]  At any time did the officer or I should say officers, give you the opportunity to talk to them?
> [COOK:]  They read me my rights.
> [DEFENSE COUNSEL]:  I'll object, Your Honor.  My client has a right to remain silent.  He doesn't need to talk to anybody. And I advised him of that.
> [STATE]:  Oh, Your Honor, before Mr. Cook spoke to counsel, he had the opportunity to talk to the police.
> [DEFENSE COUNSEL]:  He has the right to remain silent and he's commenting on that in front of the jury.
> THE COURT:  I think it'd be best to move on.

RP at 436.

*State's closing*

During closing, the prosecutor discussed E.M.M.'s testimony and how she was too

afraid of Mr. Cook to tell anyone what had happened.  During his argument, the

---

[2]  During closing argument, the prosecutor reemphasized this evidence to the jury: "I asked Mr. Cook, he had no idea why these two little girls who have such a blast at his house, would make up these horrible stories."  RP at 461.

8

prosecutor said: "She told you she was afraid. She told [defense counsel] that she was afraid. I believe her." RP at 464.

The prosecutor told the jury that the forensic child interviews "are designed, as you heard, to elicit the truth." RP at 465. He contrasted this with defense counsel's role: "The forensic interview is a different animal than the defense counsel interview. The defense counsel interview is not looking for the truth, because that's not what defense lawyers need to know to do their ethical duty to represent their client." RP at 464. Defense counsel did not object during the State's closing argument.

The jury returned guilty verdicts on all five counts.

## ANALYSIS

On appeal, Cook challenges the fairness of his trial and the sufficiency of the evidence for two convictions. The State analyzes the fairness challenges as prosecutorial misconduct claims. We agree, and we utilize this approach.

### PROSECUTORIAL DUTIES

A prosecutor functions as the representative of the people, including defendants, in a search for justice. *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). "Thus, a prosecutor must function within boundaries while zealously seeking justice." *Id.* "The prosecutor owes a duty to defendants to see that their rights to a constitutionally fair trial

are not violated." *Id.* A prosecutor prejudicially violates those rights by repeatedly committing serious misconduct to achieve convictions. *State v. Lindsay*, 180 Wn.2d 423, 442-44, 326 P.3d 125 (2014).

PROSECUTORIAL MISCONDUCT

Cook contends the prosecutor committed multiple acts of misconduct that entitles him to a new trial. Specifically, Cook contends the prosecutor (1) twice elicited improper opinion testimony, (2) improperly asked Cook to explain why his accusers would lie, (3) used Cook's post-*Miranda*[3] silence as evidence of guilt, (4) argued his personal belief in one accuser's testimony, and (5) disparaged defense counsel.

To prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The burden to establish prejudice requires the defendant to prove that there is a substantial likelihood that the instances of misconduct affected the jury's verdict. *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). The failure to object to misconduct constitutes a waiver of the error unless the misconduct is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

10

neutralized by an admonition to the jury. *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

Nevertheless, the cumulative effect of repetitive prosecutorial misconduct may be so flagrant that no instruction or series of instructions could erase their combined prejudicial effect. *Lindsay*, 180 Wn.2d at 443; *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 707, 286 P.3d 673 (2012) (quoting *State v. Walker*, 164 Wn. App. 724, 737, 265 P.3d 191 (2011), *adhered to on remand*, No. 39420-1-II (unpublished) (Wash. Ct. App. Feb. 25, 2013), http://www.courts.wa.gov/opinions/index.cfm?fa=opinions. showOpinion&filename=394201MAJ. Because this standard is met here, we review all of Cook's claims of prosecutorial misconduct whether his trial counsel objected to the misconduct or not.

### *Using witnesses to vouch for the accusers*

Cook first contends the prosecutor elicited improper opinion testimony from Detective Scott and Ms. Bedolla.

"The State cannot indirectly vouch for a witness by eliciting testimony from an expert or a police officer concerning the credibility of a crucial witness." *State v. Chavez*, 76 Wn. App. 293, 299, 884 P.2d 624 (1994). It is misconduct for the prosecutor to ask a

witness whether he or she believes another witness is telling the truth or lying. *Id.* Such

an opinion invades the province of the jury. *Id.*

Here, the prosecutor committed misconduct by having Detective Scott clearly

imply to the jury he believed Cook's accusers. In response to the prosecutor's question,

the detective testified that if he thinks someone is making a false report, he will include

this in his report and also speak to the prosecutor about it. The prosecutor then asked the

detective whether he did that here. The detective answered that he did not. The questions

and answers clearly implied that Detective Scott thought Cook's accusers were reporting

the truth. This invaded the province of the jury and impacted Cook's right to a fair trial.

The prosecutor again committed misconduct by having forensic examiner Bedolla

testify that the procedure she uses has been extensively tested to produce truthful and

accurate information, and that children who disclose sexual abuse are truthful. Both of

these statements, disguised as facts, are improper opinions that invaded the province of

the jury and substantially impacted Cook's right to a fair trial.

*Requiring Cook to explain why his accusers would lie*

Cook next argues the prosecutor committed misconduct by asking him to explain

why his accusers were lying.

12

"The practice of asking one witness whether another witness is lying 'is contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason.'" *State v. Vassar*, 188 Wn. App. 251, 257, 352 P.3d 856 (2015) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)).  This and similar questions are referred to as "liar questions." *Id.*

Here, the prosecutor asked Cook to explain why his young accusers would lie. This is a type of "liar question" because it lacked evidentiary value.  Cook, faced with such a question, could only speculate.  The question was improper and asking it was contrary to the prosecutor's duty to seek convictions based only on probative evidence.

*Introducing evidence of Cook's postarrest silence*

Cook next argues the prosecutor committed misconduct by introducing evidence of his postarrest silence.

"[T]he State violates a defendant's Fifth and Fourteenth Amendment [to the United States Constitution] rights by introducing evidence of his exercise of *Miranda* rights as substantive evidence of guilt." *State v. Curtis*, 110 Wn. App. 6, 11-12, 37 P.3d 1274 (2002).  The reason for this is that the government, in reading these rights, implicitly assures the accused that he may assert his rights without penalty.  *Doyle v. Ohio*, 426 U.S.

13

610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976); *State v. Easter*, 130 Wn.2d 228, 236, 922 P.2d 1285 (1996).

Here, the prosecutor elicited from Detective Scott that Cook chose not to speak with police after being arrested. Later, when cross-examining Cook, the prosecutor again emphasized Cook's decision not to speak with police after his arrest. The prosecutor's repeated use of Cook's silence to allow the jury to infer guilt is clear prosecutorial misconduct.

The State cites *State v. Burke*, 163 Wn.2d 204, 181 P.3d 1 (2008), and argues the prosecutor's references to Cook's postarrest silence were permissible impeachment. We disagree for three reasons. First, the prosecutor's questions to Detective Scott about Cook's postarrest silence were not asked to impeach Cook. Those questions occurred in the State's case-in-chief before Cook ever elected to testify.

Second, the prosecutor's questions to Cook about his postarrest silence were not asked to impeach him. Impeachment in this context typically emphasizes the defendant's failure to present the same exonerating evidence to law enforcement that the defendant testified about at trial. Cook did not present exonerating evidence when he testified. The only discernable purpose of the prosecutor's questions to Cook about his postarrest silence was to allow the jury to infer his guilt.

14

Third, *Burke* involves prearrest silence. States are permitted to formulate their

own rules of admissibility with respect to prearrest silence. *Id.* at 214 (citing *Jenkins v.*

*Anderson*, 447 U.S. 231, 240, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980)). This case

involves postarrest silence. Here, the State implicitly assured Cook that his silence would

not be used to infer guilt and the State reneged on its assurance. This was fundamentally

unfair and constituted a deprivation of due process. *Id.* at 213 (quoting *Doyle*, 426 U.S. at

618).

### *Closing arguments*

Cook contends the prosecutor committed misconduct in closing when he said he

believed E.M.M.'s testimony that she delayed disclosing the abuse because she was

afraid.

It is improper vouching where a prosecutor expresses a personal belief in the

credibility of a witness. *Thorgerson*, 172 Wn.2d at 443. The State concedes the

prosecutor's vouching of E.M.M.'s testimony was improper.

Cook also contends the prosecutor committed misconduct in closing when he

disparaged defense counsel. Recall, the prosecutor argued: "The forensic interview is a

different animal than the defense counsel interview. The defense counsel interview is not

15

looking for the truth, because that's not what defense lawyers need to know to do their ethical duty to represent their client." RP at 464.

A prosecutor may not impugn the role or integrity of defense counsel. *Lindsay*, 180 Wn.2d at 431-32. "Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity to present his or her case and are therefore impermissible." *Id.* at 432. Even where the defense counsel does not object to a statement impugning them, Washington courts have found such statements to be so flagrant and ill intentioned that a curative instruction would not have alleviated the prejudicial effect. *Id.* at 442-43.

In *Lindsay*, the prosecutor derided defense counsel's closing argument when he proclaimed, "'This is a crock. What you've been pitched for the last four hours is a crock.'" 180 Wn.2d at 433. Because the statements implied that defense counsel was dishonest, the court determined the prosecutor committed misconduct. *Id.* at 434. Likewise in *Thorgerson*, the State called defense counsel's arguments "'bogus'" and "'sleight of hand.'" 172 Wn.2d at 451-52. Again, because the statements implied that defense counsel was dishonest, the court determined the prosecutor committed misconduct. *Id.* at 452.

16

Here, the prosecutor said that defense counsel's ethical role is not to look for the truth. By saying this, the prosecutor said to the jury it should not believe defense counsel because his ethics do not constrain him to the truth. This back-handed compliment is as insulting as describing opposing counsel's argument as a "crock" or as "bogus."

The State argues the prosecutor's argument was appropriate, given the context. It argues the prosecutor was simply contrasting the forensic examiner's role with defense counsel's role. We do not see how this argument aids the State. Directly contrasting its own witness's supposed infallible knowledge of the truth with defense counsel's supposed disregard of the truth signals to the jury that defense counsel must be lying. This improper argument severely impacted Cook's right to a fair trial.

We have recounted several instances of prosecutorial misconduct, some quite serious. It is an understatement to say that Cook did not receive a fair trial. We reverse his convictions.

SUFFICIENCY OF THE EVIDENCE

Cook argues the State failed to present sufficient evidence to sustain two convictions—one related to A.J.M. and one related to E.M.M. We must review these challenges even though we reverse Cook's convictions. This is because double jeopardy

17

prevents retrial of a count that was not supported by sufficient evidence at trial. *State v. Thomas*, 166 Wn.2d 380, 395, 208 P.3d 1107 (2009).

When reviewing a claim of insufficiency of the evidence, this court looks to whether, when viewing the evidence in the light most favorable to the State, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *State v. Myers*, 133 Wn.2d 26, 37, 941 P.2d 1102 (1997). Necessarily, a "claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

### *A.J.M.*

Cook argues the State's only substantive evidence about A.J.M. was that he molested her once. We disagree. The State, citing RCW 9A.44.120, notes that statements of children under 10 are admissible as substantive evidence. At trial, the State played for the jury the recorded forensic interview between Ms. Bedolla and 9-year-old A.J.M. During that interview, A.J.M. said Cook molested her twice on the tractor. Although A.J.M. testified she did not recall telling anyone that Cook molested her twice, the recorded interview refutes this. This substantive evidence was sufficient to support both child molestation in the first degree convictions.

18

No. 37274-0-III
*State v. Cook*

  *E.M.M.*

Cook argues the evidence produced by the State was insufficient to establish beyond a reasonable doubt that E.M.M. was 13-years-old rather than 14 when she was abused for the third time. We disagree.

At trial, the State asked E.M.M. about the third time she was molested: "So, this happened when you were thirteen," to which she replied, "Yes." RP at 170. Also, the time line she testified to placed all three occurrences before her 14th birthday: The first occurrence was mid-September 2017, the second was "a couple months" after the first, and the third was "a couple weeks" after the second. RP at 158, 165, 170. This places the third occurrence before the end of 2017. E.M.M. did not turn 14 until late January 2018.

We conclude the State presented sufficient evidence to support both challenged convictions. The State may retry Cook on all five counts.

  Reversed and remanded.

Lawrence-Berrey, J.

WE CONCUR:

Pennell, C.J.

Staab, J.

19