IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>          Respondent,<br><br>      v.<br><br>P. L.-Q.,<br><br>          Appellant. | No. 82113-0-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, J. — After a bench trial, P. L.-Q. was found guilty of rape in the second degree by forcible compulsion, committed when he was 17-years-old. L.-Q. appeals, arguing that certain facts found by the trial court are not supported by substantial evidence and that the trial court erred by concluding that he committed rape by forcible compulsion. We agree as to the sufficiency challenge and reverse. However, we further conclude that the evidence was sufficient to support a conviction for rape in the third degree, which the defense had offered for consideration by the trial court. We remand for entry of judgment of conviction for rape in the third degree and sentencing on that offense.

FACTS

L.-Q. was found guilty of rape in the second degree following a bench trial. The charge arose from an allegation K.S. made following an incident where she stayed over at L.-Q.'s apartment after the then-high school classmates had

attended a party together. The party was hosted by one of K.S.'s coworkers, and L.-Q. went based on K.S.'s invitation to join her. K.S. consumed an unknown amount of alcohol and marijuana at the party, so L.-Q. drove them both back to Burien in K.S.'s car after they decided to leave the party.

K.S. had deceived her parents as to her whereabouts and did not believe that she could return home at that late hour without getting in trouble, so the pair went to the apartment where L.-Q. resided with his mother. They went upstairs to L.-Q's bedroom. At this point, testimony regarding what occurred diverged as to several key points.

Both L.-Q. and K.S. testified that during this interaction, L.-Q. put his hand over K.S.'s mouth and told her to be quiet. While their respective framing of the tone of this act varied, they were consistent that it was a brief aspect of the overall events. K.S. testified that she then said "no," followed by her boyfriend's name, at which point L.-Q. removed his penis from her and sexual contact ceased.

Prior to trial, the State filed an amended information which added count 2, rape in the second degree, alleging that the victim was incapable of consent by reason of being mentally incapacitated. This second charge was based on the same incident. The record demonstrates that the State sought to proceed under an alternate means theory but added a new count rather than simply amending the language of count 1 to reflect alternate means. Following the bench trial, the court found L.-Q. guilty of rape in the second degree as set out in count 1, but noted that the conviction was under both prongs alleged by the State—that the sexual intercourse occurred by forcible compulsion (count 1), and that the sexual

intercourse occurred while K.S. was incapable of consent by reason of being mentally incapacitated (count 2). L.-Q. timely appealed his conviction.

Initially, this court directed the parties to supplement the record as to the amended charging document, which added count 2. We then issued an opinion,[1] wherein we retained jurisdiction over the case, but remanded for the trial court to clarify its disposition order and findings, so that we could properly review the issues raised on appeal. On remand, the court issued an amended order on disposition that convicted L.-Q. only of count 1, rape in the second degree by forcible compulsion, and the State then moved to dismiss count 2 on double jeopardy grounds. The court granted the State's motion as to count 2, and also revised its findings of fact and conclusions of law. Having received the trial court's amended orders, we turn to L.-Q.'s assignments of error.

## ANALYSIS

I.      Substantial Evidence Challenge to Findings of Fact

L.-Q. first asserts that certain portions of the findings of fact issued by the trial court, including some framed as conclusions of law, are not supported by substantial evidence. "[F]ollowing a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." State v. Homan, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). "'Substantial evidence' is evidence sufficient to persuade a fair-minded person of the truth of the asserted premise." Id. at 106

---

[1] State v. P. L.-Q., No. 82113-0-I (Wash. Ct. App. April 4, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/821130.pdf

(quoting State v. Stevenson, 128 Wn. App 179, 193, 114 P.3d 699 (2005)). An erroneous finding of fact is harmless where it does not impact the ultimate legal conclusion. State v. Caldera, 66 Wn. App. 548, 551, 832 P.2d 139 (1992). We "defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds by Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

A.     Finding of Fact 11

L.-Q. challenges the language used by the court in finding of fact 11 (finding 11), which states in relevant part:

> K.S. remembered Respondent covering her mouth with one hand due to the amount of noise she was making, which the Respondent admitted he did. K.S. remembered clearly that she told the Respondent "No." She also remembered saying the name of her current boyfriend "Jared" and Respondent removing his penis from her. The Respondent also acknowledged he removed his penis from her after K.S. said Jared's name.

L.-Q. argues both the aspects of the finding that indicate L.-Q. "admitted" or "acknowledged" certain facts are unsupported by substantial evidence. The State concedes that the statement, "The Respondent also acknowledged he removed his penis from her after K.S. said Jared's name" is unsupported by substantial evidence. The record demonstrates that L.-Q.'s testimony, as to K.S. saying her boyfriend's name, differed from the account set out in this finding—L.-Q. made no such acknowledgement during his testimony. As such, we accept the State's concession on this point. That language in finding 11 should be stricken as unsupported by substantial evidence.

The next component of finding 11 that L.-Q. challenges is the portion indicating L.-Q. admitted he covered K.S.'s mouth due to the amount of noise she was making. L.-Q.'s framing of the noises K.S. was making, and how he responded, differed from her account, particularly as to the tenor of this interaction. Nonetheless, his testimony did include an acknowledgment that he placed his hand over her mouth out of concern for noise. As such, this portion of the finding is supported by substantial evidence in the record.

B.      Conclusions of Law 9(b) and 9(c)

L.-Q. next assigns error to conclusions of law 9(b) and 9(c), first asserting that they are actually findings of fact, rather than conclusions of law. L.-Q. is correct that, while these sub-paragraphs are set out as conclusions of law, the challenged statements begin with, "The Court finds:" and the court then expressly finds facts based on conflicting evidence presented at trial. The language in question sets out the acts the court determined constituted forcible compulsion and expressions of lack of consent by K.S.

However, despite properly preserving his challenge to these findings, L.-Q. offers no argument as to how these findings are unsupported by substantial evidence. Under RAP 10.3(6), an appellant must provide an "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." Further, the challenged findings are rooted in the trial testimony. While L.-Q. offered an account of the evening that conflicted with the testimony K.S. provided, the judge made credibility determinations and found K.S. to be the more credible witness. Disagreement with

that decision, alone, does not render the findings improper. Our deferential review of the trial record demonstrates that these findings are supported by substantial evidence.[2]

II.     Sufficiency of the Evidence for Rape in the Second Degree by Forcible Compulsion

L.-Q. initially assigned error to the trial court's original order on disposition, which found him guilty of count 1 in the amended information, based on two alternative means, and further asserted that the evidence was insufficient to support either means. Specifically, he argued that the conviction on both means could not be supported by substantial evidence, as these particular bases for rape in the second degree are mutually exclusive. However, as explained above, due to the manner by which the State charged this case it did not involve alternative means, but rather two separate counts of rape in the second degree arising from a single set of facts. Having addressed this procedural issue in our prior opinion, and received a corrected order on disposition from the trial court, we turn now to the second aspect of L.-Q.'s challenge to his conviction: the sufficiency of the evidence underlying his conviction.

"When reviewing a claim of insufficiency of the evidence, this court looks to whether, when viewing the evidence in the light most favorable to the State, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." State v. Cook, 17 Wn. App. 2d 96, 110-11, 484 P.3d 13 (2021). "A claim

---

[2] L.-Q. also challenged the final sentence in finding of fact 7 as it related to the allegation contained in count 2. However, in light of the amended order on disposition, and dismissal of count 2, we need not reach this assignment of error.

of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Credibility determinations are solely for the fact finder and are not reviewable on appeal. State v. Brockob, 159 Wn.2d 311, 336, 150 P.3d 59 (2006).

RCW 9A.44.050(1)(a) sets out the elements of rape in the second degree by forcible compulsion as follows: "A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person . . . [b]y forcible compulsion." Forcible compulsion is defined as "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." RCW 9A.44.010(3).[3] Our case law has defined forcible compulsion as that which is "directed at overcoming the victim's resistance and [i]s more than that which is normally required to achieve penetration." State v. McKnight, 54 Wn. App. 521, 528, 774 P.2d 532 (1989). "The resistance that forcible compulsion overcomes need not be physical resistance, but it must be reasonable resistance under the circumstances." State v. Gene, 20 Wn. App. 2d 211, 224, 499 P.3d 214 (2021).

Our court's recent decision in Gene is the most illuminating to the facts before us. In that case, Gene and K.M. had a prior "brother-and-sister-like

---

[3] Former RCW 9A.44.010(6) (2007) was the statute in effect at the time of the crime at issue in this case. In 2020, that section was amended and some sections were renumbered. LAWS OF 2020, ch. 312, § 707. Because the definition of "forcible compulsion" was unchanged, simply renumbered from subsection (6) to subsection (3), we cite to the current statute.

friendship." Id. at 213. They were at K.M.'s apartment complex where they consumed alcohol and used the hot tub together. Id. at 213-14. Later K.M. began to feel "unstable and sick," and eventually threw up. Id. at 214. She went up to her bedroom to sleep. Id. At some point, Gene entered the room and began to digitally penetrate K.M. Id. at 216-17. He then initiated sexual intercourse with her. K.M.'s testimony was that, despite the fact that she felt "uncomfortable" during the overall interaction, she did not voice any lack of consent until sexual intercourse had occurred. Id. at 217-18. At one point during the act, Gene pulled away and K.M. wrapped herself in a blanket, which Gene then tried unsuccessfully to pull off of her. Id. at 219-20. At that point, K.M. screamed at him to get out. Id. at 220. After K.M. covered herself with the blanket and screamed for Gene to get out, there was no further sexual contact. Id. at 220-21.

In that case, which had been charged under an alternate means theory, based on both forcible compulsion and the victim's incapacity to consent due to intoxication, we concluded that there was insufficient evidence as to the allegation based on forcible compulsion. Id. at 226. The court noted that there was no evidence of resistance leading up to the sex acts, and the victim had testified she was unconscious or unable to respond, such that "she could not resist the penile-vaginal assault and there was no resistance for Gene to overcome." Id. at 224-25. Of particular bearing on the case at hand, we rejected the State's argument in Gene that "evidence of Gene positioning K.M.'s body and forcefully removing her clothing is evidence of force overcoming K.M.'s resistance." Id. at 225. We determined that Gene had only utilized force necessary to engage in sexual

- 8 -

intercourse or contact, not to overcome resistance. Id. The court noted that when K.M. did resist, by covering herself with the blanket and screaming, Gene did not take steps to overcome her actions. Id. at 226.

Here, we are presented with a similar fact pattern—two youths consumed intoxicants and eventually wound up sleeping in the same room after the complaining witness felt she had become intoxicated. L.-Q. eventually began touching K.S. and taking off her clothing, and continued to initiate sexual intercourse. K.S. testified that she neither resisted nor assisted in the removal of her clothes, she was crying at one point either when penetration occurred or shortly after, and L.-Q. then covered her mouth to tell her to be quiet. K.S. said the sex act ended when she said no, followed by her boyfriend's name.

Though the State argues L.-Q. covering K.S.'s mouth constituted forcible compulsion, these circumstances show otherwise. The evidence adduced at trial does not support a determination that this act amounted to a use of force to overcome resistance.[4] As an initial matter, K.S. testified that prior to L.-Q. covering her mouth, she was crying and scratched his back. However, she did not testify that she had otherwise expressed a lack of consent, physically resisted, or been restrained by L.-Q. at that point in the interaction. K.S.'s testimony provided no indication that she found the act of L.-Q. covering her mouth to be threatening or cause her fear, that it was intended to suppress calls for help or restrain her, or

_____

[4] The dissent emphasizes K.S.'s level of intoxication and provides significant excerpts from her testimony in that regard. However, her drug and alcohol use that night does not impact our consideration of K.S.'s expression of lack of consent. The court explicitly found, based on her testimony, that crying and scratching L.-Q.'s back conveyed her non-consent. We accept that as a fact and focus our review on the sequence of events as supported by the trial testimony and court's findings. Nothing in our analysis should be construed as suggesting that K.S.'s resistance was legally insufficient, or that she was otherwise required or expected to resist differently.

anything more than a fleeting action. L.-Q. testified he was attempting to remind K.S. that his mother was in the next room and they needed to be quiet. K.S. testified similarly when asked by the State about why she believed L.-Q. covered her mouth—because there was another relative in the home and L.-Q. was concerned they would be heard.

Even disregarding L.-Q.'s testimony about this aspect of the incident, the evidence does not demonstrate that placing his hand over K.S.'s mouth and saying "be quiet" constituted forcible compulsion. As noted by defense counsel in closing argument, consideration of the temporal aspects of the incident are critical, particularly with regard to the statutory definition of forcible compulsion, and the clarification of that definition offered by McKnight. Even if the hand over the mouth portion of the interaction could be considered "physical force which overcomes resistance" under the statutory definition, McKnight clarifies that:

> Where the degree of force exerted by the perpetrator is the distinguishing feature between second and third degree rape, to establish second degree rape [by forcible compulsion] the evidence must be sufficient to show that the force exerted was directed at overcoming the victim's resistance and was more than that which is normally required to achieve penetration.

54 Wn. App. at 527-28. K.S. testified on direct examination that she felt "stuck" when L.-Q. undressed her and that after this occurred, L.-Q. inserted his penis into her. She was then asked how she responded to the penetration and she said she was crying and remembered "scratching his back." She then testified that after she scratched his back, he told her to be quiet and covered her mouth. When the State questioned her about why L.-Q. would have told her to be quiet, K.S. noted that he said this in a tone that was not loud, but "serious," and was because his

relative was in the home. Presumably, for reasons similar to her stated basis for deciding against returning to her own home after the party, the teens didn't want to get caught breaking the rules. However, K.S. clearly testified that penetration had already occurred by this time. Her characterization of this aspect of the incident does not establish that this act was directed at overcoming her resistance or "more than that which is normally required to achieve penetration." McKnight, 54 Wn. App. at 528. While the State argued in rebuttal closing that L.-Q. placed his hand over K.S.'s mouth to prevent her from calling for help, K.S. never testified that she wanted or attempted to cry for help.

The State urges us to follow McKnight when considering the facts adduced at L.-Q.'s trial, but, while that case is instructive with regard to defining forcible compulsion, it is factually distinct, particularly as the victim there repeatedly told McKnight to stop both when he was kissing her and when he was taking off her clothes. 54 Wn. App. at 522-23. This is a clear verbal expression of lack of consent, whereas here the nonverbal expression of lack of consent identified by the trial court, crying and scratching L.-Q.'s back, did not occur until after penetration and the verbal expressions of non-consent were made right before the cessation of intercourse. The court in McKnight also emphasized that the two had no prior relationship, there was a substantial strength differential between McKnight and the victim, and an age gap more significant than the one before us. Id. at 526-27. Perhaps the most relevant distinction was that, even after the victim had told him to stop numerous times, McKnight remained physically on top of her, impeding her ability to remove herself from the situation. Id. at 522-23. This is

markedly different from the facts presented here. McKnight featured physical restraint by an older and much stronger assailant after the victim repeatedly told him to stop;[5] the force used to pin down the victim was more than that necessary to achieve intercourse, and persisted after the repeated communication of lack of consent. No such facts are present in this record.

The evidence does not show that L.-Q. used force to overcome resistance from K.S. to effectuate intercourse. Even taken in the light most favorable to the State, the evidence demonstrates the first expression of lack of consent occurred after penetration, and L.-Q.'s placing of his hand over K.S.'s mouth was, according to her testimony, momentary and intended to convey his desire for her to "be quiet because his aunt was there."[6] She did not testify that she perceived it as a threat or an attempt to restrain her. The evidence was insufficient to support a conviction for rape in the second degree by forcible compulsion.

III.    Rape in the Third Degree

Relying on In re Personal Restraint of Heidari, the State argues in briefing that, in the event we determine the evidence was not sufficient to support L.-Q.'s conviction for rape in the second degree by forcible compulsion, we could conclude that he committed the lesser offense of rape in the third degree and remand for sentencing on that crime, because the fact-finder had been instructed on it at trial.

---

[5] The case also properly notes that physical resistance is not required, and recognized that resistance may take different forms, verbal or otherwise, depending on the unique circumstances of each criminal allegation. McKnight, 54 Wn. App. at 525.

[6] K.S. testified that the adult in the home was L.-Q.'s aunt, and L.-Q. testified that it was his mother he was concerned would hear them. While the discrepancy is noted, it ultimately has no bearing on our analysis.

174 Wn.2d 288, 293, 274 P.3d 366 (2012). In closing argument, counsel for L.-Q. argued the State had not met its burden with regard to the element of forcible compulsion, citing not only the statutory definition as set out in the Washington Pattern Jury Instructions (WPICs),[7] but also this court's decision in McKnight. He noted that the act of L.-Q. placing his hand over K.S.'s mouth occurred after penetration, arguing that it could not, therefore, be "more than that which is normally required to achieve penetration"[8] as defined in case law. However, the defense then conceded that, if the court found K.S.'s testimony credible, the only crime it could support would be rape in the third degree. Counsel for L.-Q. had filed an instruction on rape in the third degree as a lesser-degree offense to the charged crimes, in the event that the court ultimately determined the evidence adduced at trial more closely fit that offense. The State did not object to the court's consideration of that instruction.

The version of RCW 9A.44.060 in effect at the time of this incident defines rape in the third degree as occurring when a "person engages in sexual intercourse with another person: (a) Where the victim did not consent as defined in RCW 9A.44.010(7)[[9]] to sexual intercourse with the perpetrator and such lack of consent was clearly expressed by the victim's words or conduct."[10] There is no force element required for rape in the third degree. It could be sufficient under the statute

---

[7] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 45.03 (5th ed. 2021).

[8] McKnight, 54 Wn. App. at 528.

[9] Former RCW 9A.44.010(7) (2007) was the statute in effect at the time of the crime at issue in this case. In 2020, that section was amended and some sections were renumbered. LAWS OF 2020, ch. 312, § 707. The definition of "consent" was unchanged, but was renumbered from subsection (7) to subsection (2).

[10] The current version of RCW 9A.44.060(a) does not contain the clause requiring clear expression of lack of consent.

that a person engages in or continues intercourse, or as set out in McKnight, uses only the force necessary to achieve intercourse after an expression of lack of consent. In finding 11,[11] the court expressly found that K.S. "cr[ied] and scratch[ed] [L.-Q.'s] back in order to communicate to him that she did not consent."

To be clear, the acts of crying and scratching another person's back, combined or independently, do not always express lack of consent. Indeed, in other factual contexts, each behavior could actually evidence affirmative consent or otherwise natural responses during the course of consensual sexual conduct. However, K.S. expressly testified that her intent behind those particular actions was to convey that she "didn't want what was going on." The court was able to hear all of the evidence from the parties, and observe the tone and demeanor of each witness, before deciding who was more credible—it expressly found that K.S. was. We do not reweigh or disturb credibility determinations by the trial court. In re Pers. Restraint of Davis, 152 Wn.2d 647, 680, 101 P.3d 1 (2004). We recognize that the acts relied upon to make this finding, taken together or independently, could have multiple interpretations, but in this case, we defer to the trial court that the intent and meaning conveyed by K.S. was sufficient to communicate a lack of consent.

Taking this point in the incident as an expression of lack of consent, and K.S.'s testimony as credible as found by the trial court, the testimony demonstrates the following chronology:

---

[11] Consistent with the first opinion issued in this case, the court issued amended findings of fact and conclusions of law after it corrected the order on disposition. Much of the language in the amended findings and conclusions, which were filed in this court at the direction of the panel, mirrors that in the original findings and conclusions.

- L.Q. kissed K.S., and she did not recall how she reacted.

- L.-Q. undressed K.S. without her assistance or resistance, verbal or otherwise.

- L.-Q. penetrated K.S.'s vagina with his penis.

- After intercourse had begun, K.S. expressed her lack of consent by crying and scratching L.-Q.'s back.

- L.-Q. continued intercourse after this expression of K.S.'s lack of consent until she said no and her boyfriend's name, at which point he ceased the sexual contact.

K.S. was questioned about whether she had "any sense of how long this was going on" and she replied that she did not. Accordingly, the record does not establish how much time passed between her expression of non-consent by crying and scratching L.-Q.'s back, when she first said "no" and uttered her boyfriend's name, and when L.-Q. withdrew his penis; it could have been seconds or several minutes. To be clear, the law does not require a particular duration to support a conviction for rape. WPIC 45.01 ("Sexual intercourse means [that the sexual organ of the male entered and penetrated the sexual organ of the female and occurs upon any penetration, however slight]"). But, when considering whether rape has occurred (that is, penetration in the absence of consent), as opposed to cessation when lack of consent is conveyed or earlier consent is withdrawn, such nuanced consideration of the evidence is critical. L.-Q.'s removal of K.S.'s clothes was not force applied to overcome resistance as the evidence demonstrated that, similar to the facts in Gene, though admittedly for different reasons, there was no

resistance to overcome at that point in the interaction. 20 Wn. App. 2d at 224-25. As explained in the previous section, once there was resistance in the form of non-consent communicated by K.S. crying and scratching, there is no evidence of the use of force to overcome it. There was, however, evidence that intercourse continued for some period of time between the communication of K.S.'s lack of consent and when L.-Q. ultimately ceased the sex act. These facts satisfy the elements of rape in the third degree.

We reverse the conviction for rape in the second degree by forcible compulsion, as unsupported by sufficient evidence, and remand for the trial court to vacate that conviction. We further direct the trial court to enter judgment of conviction for rape in the third degree and resentence L.-Q. accordingly.

Reversed and remanded.

I CONCUR:

<u>State of Washington v. P. L.-Q.</u>, No. 82113-0-I

COBURN, J. (dissenting) — I respectfully dissent from the majority's holding that there was insufficient evidence to support a conviction of rape in the second degree by forcible compulsion. I concur in all other respects.

FACTS

K.S. testified that she became intoxicated at the party she and L.-Q. attended, mixing alcohols together, becoming drunk for the first time, and smoking marijuana. K.S. remembered "barely being able to go up the stairs" at the party due to her level of intoxication. K.S. had initially planned to spend the night at a female friend's home. After leaving the party, L.-Q. drove K.S. in her car to his apartment complex and helped her out of the seat, as she was still intoxicated and had fallen asleep on the 30- to 40-minute drive there. While K.S. had picked up L.-Q. from outside the complex on prior occasions, she had never been inside of L.-Q.'s apartment. K.S. next remembers being in L.-Q.'s bedroom, where she laid down on the bed because she was "tired" and "just wanted to sleep."

After K.S. laid on the bed, L.-Q. got on the bed, positioning himself between K.S. and the bedroom door. L.-Q. then attempted to kiss K.S., though she does not remember how she reacted. L.-Q. then removed K.S.'s leggings and underwear. She did not assist him in removing her clothing. K.S. felt "stuck" and "didn't know what was going on." K.S. testified that after L.-Q. took off her clothing, she remembered "him getting on top and him just putting him inside of

me." At trial, the State attempted to break down the timing of how and when K.S.

responded to the situation. The following examination ensued:

[PROSECUTOR]: And you say he got on top of you, so you were laying on the bed?

[K.S.]: Yes, on my back.

[PROSECUTOR]: And what did he do?

[K.S.]: Put his penis inside of me.

[PROSECUTOR]: Did you know what was happening at this time?

[K.S.]: Yes.

[PROSECUTOR]: How did you respond?

[K.S.]: I was crying and I remember scratching his back.

[PROSECUTOR]: Could you describe what you mean when you say "scratching his back." What do you mean? What kind of contact?

[K.S.]: I was crying. I didn't know what to do. I was doing anything to try to, like, make it obvious that I didn't want what was going on.

[PROSECUTOR]: Were you able to successfully scratch his back?

[K.S.]: Yeah. I scratched him, and then he was telling me to be quiet and then he covered my mouth.

[PROSECUTOR]: Why did he – so he wanted you to be quiet because – were you saying –

[K.S.]: His aunt was there and I was crying, and then I remember he just told me, "Be quiet."

[PROSECUTOR]: Could you describe the tone when he said to be quiet?

[K.S.]: Serious. I don't know. It wasn't loud because he wanted to be quiet because his aunt was there, so it's not like he could scream at me or anything.

[PROSECUTOR]:  Were you saying any words or were you –

[K.S.]:  I remember saying "No," and then I was crying, and then I remember saying Jared's name.
. . . .

[PROSECUTOR]:  And at this point when you were crying and scratching his back, what is [L.-Q.] doing to you at this point?

[K.S.]:  Well, he was still going after covering my mouth; and then I kept saying Jared's name, and I assume that's why he got off.

[PROSECUTOR]:  So just to be clear, when you say "still going," meaning his penis was still going in your vagina?

[K.S.]:  Yes.

[PROSECUTOR]:  Did you have any sense of how long this was going on?

[K.S.]:  No.

[PROSECUTOR]:  Did he seem to respond at all when you were scratching his back?

[K.S.]:  No.

[PROSECUTOR]:  Did he respond at all when you started crying?

[K.S.]:  No.

[PROSECUTOR]:  Did he respond at all when you were saying "no"?

[K.S.]:  No.

[PROSECUTOR:]  And I think you said he finally responded when you said "Jared."

[K.S.]:  Yes.

[PROSECUTOR]:  Do you, if you know, know how many times you said "No" or "Jared"?

[K.S.]:  I remember saying "Jared" a lot.

[PROSECUTOR]:  Do you remember how many times you said "No"?

[K.S.]:  Once.

[PROSECUTOR]:  And, then, you mentioned that he put his hand over your mouth.

[K.S.]:  Yes.

[PROSECUTOR]:  Was that in response to anything?

[K.S.]:  The crying, I think.

K.S. testified that L.-Q. covered her mouth "with his palm flat down, with his fingers closed."  This prevented K.S. from making additional noise.  K.S. testified that L.-Q. did not stop until K.S. said her boyfriend's name, which appeared to anger L.-Q., who stopped and "kind of threw himself" toward the other side of the bed with his back toward her.  K.S. next remembered waking up in L.-Q.'s bed, still unclothed, hours later.

DISCUSSION

As stated by the majority, "when reviewing a claim of insufficiency of the evidence, this court looks to whether, when viewing the evidence in the light most favorable to the State, a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt."  State v. Cook, 17 Wn. App. 2d 96, 110-11, 484 P.3d 13 (2021).  "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  State v. Salina, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  "'[C]redibility determinations are for the trier of fact' and are not subject to review."  State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017) (quoting State v. Camarillo, 115 Wn.2d

- 4 -

60, 71, 794 P.2d 850 (1990), abrogated on other grounds by State v. Crossguns, 199 Wn.2d 282, 505 P.3d 529 (2022)).  "A reviewing court will reverse a conviction for insufficient evidence only where no rational trier of fact could find that all elements of the crime were proved beyond a reasonable doubt."  State v. Smith, 155 Wn.2d 496, 501, 120 P.3d 559 (2005).

The trial court found "K.S.'s testimony to be entirely credible" and specifically adopted K.S.'s version of the events as fact.  In addition, the trial court discredited L.-Q.'s narrative, stating the "Court did not find the manner or the content of the Respondent's testimony during the key moments of the incident to be credible."  The trial court explicitly declined to adopt L.-Q.'s testimony of the events.  As a result, we view K.S.'s version of events in the light most favorable to the State.

"A person is guilty of rape in the second degree when . . . the person engages in sexual intercourse with another person by forcible compulsion."  RCW 9A.44.050(1)(a).  Forcible compulsion is physical force which overcomes the victim's resistance to the rape.  RCW 9A.44.010(3).  Such force must be directed at overcoming the victim's resistance and be more force than necessary to achieve penetration.  State v. Gene, 20 Wn. App. 2d 211, 224, 499 P.3d 214 (2021).  Forcible compulsion is "'not the force inherent in any act of sexual touching, but rather is that used or threatened to overcome or prevent resistance by the [victim].'"  State v. Corey, 181 Wn. App. 272, 277, 325 P.3d 250 (2014) (alteration in original) (internal quotation marks omitted) (quoting State v. Ritola, 63 Wn. App. 252, 254-55, 817 P.2d 1390 (1991)).  "The resistance that forcible

compulsion overcomes need not be physical resistance, but it must be reasonable resistance under the circumstances." Gene, 20 Wn. App. 2d at 224 (citing State v. McKnight, 54 Wn. App. 521, 774 P.2d 532 (1989)).

I agree with the majority that "the temporal aspects of the incident are critical" in determining whether the force exerted was directed at overcoming the victim's resistance and was more than that which is normally required to achieve penetration. However, because we must view the evidence in the light most favorable to the State, I disagree with the majority that K.S. "clearly testified that penetration had already occurred" by the time she was crying and scratched L.-Q.'s back. I also disagree that there is no testimony in the record to suggest that K.S. "wanted or attempted to cry for help."

K.S. was very intoxicated by multiple substances, to the point where she needed physical assistance to both get up a set of stairs and to get out of a car. She remembered laying down on the bed and wanting to sleep when L.-Q. removed her clothes. She did not know what was going on and could not remember how she reacted to L.-Q. removing her clothes but knew that she did not assist him. After K.S. testified that L.-Q. got on top of her and put his penis inside of her, the State asked K.S. to elaborate on the specifics of what occurred "at this time." K.S. said she remembered crying and scratching L.-Q.'s back. When the State asked what she meant when she said "scratching his back," K.S. said she was "doing anything to try to, like, make it obvious that I didn't want what was going on." When asked what words she was using, K.S. testified that she said "No," and then cried, and then repeatedly said her boyfriend, Jared's,

name while crying. K.S. testified that L.-Q. told her to be quiet and put his hand over her mouth in response to her crying because his aunt was in the house. When the State asked what L.-Q. was doing at the point when K.S. was crying and scratching his back, K.S. said, "he was still going after covering my mouth; and then I kept saying Jared's name, and I assume that's why he got off." The State followed-up and asked, "So just to be clear, when you say 'still going,' meaning his penis was still going in your vagina?" K.S. answered, "Yes." K.S. did not have a sense of how long the events took place.

A reasonable trier of fact could find that K.S. started resisting at the time L.-Q. tried to place his penis inside K.S., and that this resistance included saying "No," scratching his back and crying loud enough that L.-Q. had to put his hand over her mouth to prevent the other person in the house from hearing K.S. This action was more force than was necessary to achieve penetration.

Given K.S.'s level of intoxication, a reasonable trier of fact could find K.S.'s verbal resistance was reasonable under the circumstances. See McKnight, 54 Wn. App. at 527 (finding that a reasonable fact finder could conclude that victim's verbal resistance was reasonable under the circumstances where the victim was physically weak and unsophisticated).

The majority cites State v. Gene as a case with a similar fact pattern. But Gene is distinguishable. The victim in Gene, K.M., testified that she did not initially respond to having her vagina penetrated because she was "blacked out drunk." Gene, 20 Wn. App. 2d at 217. This court recognized that K.M. "was unconscious or unable to voice any such resistance." Id. at 225.

- 7 -

> The force exerted by Gene was not employed to overcome any resistance posed by K.M.
>
> Rather, the force Gene used to move K.M.'s body into a prone position, separate her legs, and remove her shorts was nothing more than the force "needed to bring about sexual intercourse or sexual contact." When K.M. was able, she did resist, both by wrapping herself in a blanket and by yelling at Gene to "Get out. Get the fuck out. Leave." This resistance was successful, and Gene did not overcome it.
>
> Under these circumstances, no reasonable juror could find beyond a reasonable doubt that Gene resorted to forcible compulsion to engage in penile penetration of K.M.'s vagina. Thus, a constitutionally insufficient quantum of evidence supports Gene's conviction for rape in the second degree by means of forcible compulsion.

Id. at 225-26 (citations omitted).

Unlike the victim in Gene, K.S. did not wake up to find L.-Q. inside of her and then react after the fact. K.S. was aware of him climbing on top of her and she responded at that time by saying "No," scratching his back and crying loud enough to where he had to cover her mouth with his hand and tell her to be quiet. Despite this, he continued to put his penis inside of her vagina.

The majority next distinguishes McKnight, because the victim "repeatedly told McKnight to stop both when he was kissing her and when he was taking off her clothes" there was a "clear expression of lack of consent." But K.S. testified that she said, "No." Regardless, there is no exclusive means as to how one should resist. The resistance simply needs to be reasonable under the circumstances.

Based on the evidence presented, I cannot agree that no reasonable finder of fact could conclude that the force exercised here was more than required to achieve penetration and that the force was directed at overcoming

K.S.'s resistance.  Viewing the evidence in the light most favorable to the State, there was sufficient evidence to support a trier of fact's finding of guilt of rape in the second degree by forcible compulsion.  Accordingly, I would affirm.  For this reason, I respectfully dissent.

_____Coburn, J._____