# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56586-2-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| RICK LEFT HANDED WOLF STONE, aka RICK DANIEL KELLY, | |
| Appellant. | |

CHE, J. — Rick Left Handed Wolf Stone doused Mitchel Kedalo and his car with gasoline and then ignited the gasoline. The jury convicted Stone of attempted first degree murder and first degree arson. The trial court found Stone indigent and imposed the jury demand fee, the criminal filing fee, and the victim penalty assessment (VPA) fee.

On appeal, Stone raises a violation of double jeopardy, prosecutorial misconduct, violation of his right to confer with counsel, violation of his right to a fair and impartial jury, cumulative error, violation of his right to control his defense, ineffective assistance of counsel, and unlawful legal financial obligation (LFO) claims. We affirm the convictions but remand for the trial court to strike the jury demand fee, criminal filing fee, and VPA. Stone's other challenges fail.

FACTS

I. BACKGROUND

Stone doused Kedalo and his car with gasoline while it was parked at a gas station and then ignited the gasoline. The State charged Stone with attempted first degree murder and first degree arson.

II. PRETRIAL PROCEEDINGS

The parties stipulated that there were eight pretrial hearings in this matter, including a first appearance and a speedy trial waiver hearing. All the hearings occurred via video conferencing. Stone and his counsel participated in the hearings from different locations.

At the first appearance, the trial court set bail at two and a half million dollars for the relevant charges and appointed counsel for Stone. An attorney represented Stone at the first appearance. At the arraignment hearing, the trial court explicitly informed Stone that he could bring up bail anytime. At a hearing to modify bail, Stone's counsel requested lower bail, which the trial court denied.

At a subsequent hearing, Stone's counsel agreed to a continuance and presented a speedy trial waiver. The trial court asked Stone if he assented to the waiver, to which Stone responded affirmatively. Stone had affirmed that he was informed of his speedy trial rights and signed a waiver before going to the aforementioned hearing.

Stone did not object to the format of the pretrial proceedings.

III. VOIR DIRE

Counsel for Stone asked the venire, "I don't know if you heard my client's last name, Left Hand Wolf Stone but if that means anything to anybody. Does that ring any bells to

anybody?" Rep. of Proc. (RP) (Nov. 8, 2021) at 102. One juror responded, "Native American."

RP (Nov. 8, 2021) at 102. Counsel went on to ask about the jurors' feelings about Native

Americans. The following colloquy occurred with Juror 32:

> POTENTIAL JUROR 32: I have elderly grandparents down in Madris in Warm Springs reservation. In my experience with them, my wife and I coached a couple, and the depression that is hung over these people. People in this room don't know that when some American Natives reach a certain age, they just take their children and drop them off at the nearest relative, and then that relative sits there and raises their children. And, you know, they get to the point where, okay, I've done enough here, and then they pass the children off. And that is not right. It's not right.
>
> MS. MICHALEK: Doesn't sound right.
>
> POTENTIAL JUROR 32: And that's from experience. That's the honest to God truth.
>
> MS. MICHALEK: And, yeah, that is not right. I suppose that would make kids who feel abandoned.

RP (Nov. 8, 2021) at 103.[1]

Another potential juror shared about her experience on a Navajo reservation learning

more about the people. Later, the State moved to strike Juror 32 citing concerns about Juror 32's

ability to hear only approximately 80 percent of the proceeding[2] and inability to make a

judgment about another person under those circumstances. Stone acknowledged that Juror 32

expressed difficulty hearing the proceeding and deferred to the trial court's judgment. The trial

court excused Juror 32 for cause. Stone did not move to strike the venire. Nor did Stone

exercise all of his peremptory strikes.

---

[1] While it is not entirely clear which juror made the challenged statement from the record, the transcript of voir dire indicates that Juror 32 had something to say before making the aforementioned statement. And both parties agree on appeal that Juror 32 made the challenged statement.

[2] Juror 32 expressed difficulty with hearing during voir dire. The trial court provided headphone equipment, but Juror 32 expressed continued difficulty hearing.

IV. TRIAL

A.     *Evidence Presented*

On the same day that the fire took place, Pauline Crowell, Stone's friend, walked to the gas station where Stone and his girlfriend, Renae Bersoza, were waiting for a ride. Subsequently, Crowell and Bersoza had a conflict with Kedalo, who was in a car, that ended with Kedalo hitting Bersoza's bicycle with his car. Stone appears to have engaged in a physical altercation with Kedalo. Stone, Crowell, and Bersoza left.

Later that day, Billy Nelson rode his bicycle to meet Stone. Nelson was interested in buying Stone's chainsaw. Stone appeared not to have gas to test it, so they went to a nearby gas station. During this interaction, Nelson recalled Stone saying, "[Stone] had an altercation with somebody that tried to supposedly force himself upon his girlfriend [Bersoza]." RP (Nov. 9, 2021) at 232.

When they arrived at the gas station, Stone, who was wearing a reflective jacket and carrying a gas can, walked up to Kedalo's car and began dumping gasoline on Kedalo's car, including through the open driver's side window. Kedalo got out and appears to have had some sort of altercation with Stone. Stone ignited the gasoline, setting Kedalo and his car on fire.

While Nelson did not see anyone immediately adjacent to the burning car, there were many people in the general vicinity. The fire department station captain saw Kedalo's car engulfed in flames. The captain was concerned about the proximity of the flames to the gas pumps, "[b]ut at the time it didn't pose a significant threat of exposure in my mind." RP (Nov. 9, 2021) at 192. The captain also had concerns with the proximity of others to the fire as car

fires produce highly toxic fumes. The fire marshal maintained that the car was about 20 to 30 feet from the gas pump.

Stone threw off the reflective jacket he was wearing a couple of blocks away from the gas station. The police found the reflective jacket in the direction that Stone fled. The reflective jacket bore the personal name, Cesar Carino Leon, and the company name, Spike Builders.[3] The police sent the jacket to the Washington State Patrol's laboratory for deoxyribonucleic acid (DNA) and chemical testing.

A forensic scientist determined that the stain on the collar of the jacket almost certainly matched the DNA profile of Stone.[4] A different forensic scientist determined that the jacket had gasoline on it.

At trial, the predominant issue was whether it was Stone who set the fire. Kedalo said that the person he fought with earlier in the day did not appear to be the same person that started the fire. One witness couldn't remember if Kedalo told him that one or two people were involved in setting the fire. And a bystander said there were three men fleeing after the fire began. Stone also provided an alibi, as discussed below.

B.      *Challenged Witness Examinations*

The State elicited the following testimony from Detective David Chamblee:

Q.      Did you ever get contacted by a witness in this case named Pauline Crowell?
A.      No.
Q.      C-R-O-W-E-L-L?

---

[3] Leon testified that his reflective jacket provided by his work was stolen from his vehicle during a vehicle prowl.

[4] There were other DNA samples also found on the jacket, including that of Renae Bersoza.

A.     I haven't been contacted by anybody willingly in this case.

Q.     Named Pauline?

A.     No.

Q.     You've been contacted by other willing witnesses though, correct?

A.     In a roundabout way, yes.

Q.     But you've interviewed a lot of people?

A.     I've interviewed Billy Jean Nelson, who's been the sole person that's come to me.

RP (Nov. 10, 2021) at 421-22.  Later, Detective Chamblee reiterated, "Like I said, the only person who's come to me, a willing witness, was Mr. Nelson."  RP (Nov. 10, 2021) at 424. Stone did not object to this line of questioning.

Pauline Crowell was an alibi witness for Stone.  As mentioned above, before the fire, Crowell and Bersoza had a conflict with Kedalo, who was in a car, which ended with him hitting Bersoza's bicycle with his car.

On direct, Crowell testified that Stone came running to defend Bersoza when Kedalo hit Bersoza's bicycle.  On cross-examination, Crowell testified that Stone wasn't initially involved in the conflict as he was in the gas station.  The State played an earlier recording from Crowell's interview with the defense investigator wherein Crowell admitted that Stone hit Kedalo.

The State asked Crowell about that statement and the following exchange ensued:

Q.     But when you testified before, you said during this conflict with the brown cow -- brown-hatted cowboy in the Cadillac who's tall --

A.     Uh-huh.

Q.     -- Rick was in the store the whole time --

A.     Uh-huh.

Q.     -- and not involved --

A.     Uh-huh.

Q.     -- in the conflict?

A.     That's right.

6

Q. Do you remember your testimony under oath?

A. Uh-huh.

Q. And now when you have this interview, you're talking about Rick actually not being in the store but actually hitting -- hitting -- you said he hit this guy. So which is it? Were you lying then in this interview, or are you lying to these jurors today? Which day were you not telling the truth? Just tell us which day.

A. Well, I'm not lying to you. It's the way he's worded it to me. The first conversation about Rick not hitting the guy, he asked is he in a fight with him. At that point he was not. He was still in the store when the fight started. It was [Bersoza] and the guy. And then he came out of the store. It's the way the man is questioning me.

Q. Fair enough.

RP (Nov. 10, 2021) at 455-56. Stone did not object to this line of questioning.

Crowell maintained that after the conflict, Bersoza, Stone, and herself proceeded to Crowell's apartment. Crowell testified that Stone and Bersoza remained at her apartment during the fire.

C. *Challenged Limiting Instruction*

Before trial, the trial court and the parties discussed a limiting instruction regarding what the jury may infer from the theft of Leon's jacket. The trial court appears to have first raised the possibility of giving a limiting instruction. The State provided a draft limiting instruction prior to opening statements. Stone wanted to think about whether it was properly worded.

The State broached the jacket limiting instruction after the close of evidence. Stone responded, "And I don't think it's necessary actually at this time. I don't think that there's been any inference that he's responsible. I don't think it's required actually." RP (Nov. 10, 2021) at 475-76. Stone explained, "the Defense might want to infer that he was involved with the vehicle prowl. I mean, if I consider all the evidence, it might make sense that he was involved in a

7

vehicle prowl rather than something else." RP (Nov. 10, 2021) at 478. The next day, the trial court reviewed the jury instructions, including the limiting instruction, with the parties one final time and asked for objections. Stone did not object to any instruction.

The trial court gave the following jury instruction:

> The evidence that Cesar Leon's vehicle may have been broken into is admitted for a limited purpose of explaining the safety [jacket] and where it may have come from. The jury may not infer that the defendant was involved in any way with this vehicle prowl.

Clerk's Papers at 38. In closing, Stone argued that Stone may have stolen the jacket, but "we'll never know." RP (Nov. 12, 2021) at 540.

D.    *Challenged Conduct in Closing*

In closing, the State made the following argument:

> in light of Billy Jean Nelson's testimony and the Defense witness's testimony, one of those people came in here and took the stand and swore to tell you the truth, and one of those people lied. They committed perjury right in front of you because their testimony is diametrically opposed and opposite to one another. They can't both be right. One of them committed perjury.
>
>    And when you look at her not knowing the building, describing Kedalo as a cowboy in a brown Cadillac, and saying that he never was out there during the conflict when the video evidence shows he never went in the store, it was Renae Bersoza that went in the store while he was outside with the bike walking around, standing around outside the store, and you have video testimony showing he was there during the conflict, so we all should conclude and know who committed perjury in this trial.

RP (Nov. 12, 2021) at 524-25. Stone did not object.[5]

---

[5] Notably, the State emphasized, in closing, "You don't go to a [gas station] with kids and people and couples and pets and throw gasoline on a vehicle in the middle of that gas station . . . and light it on fire and think that's not arson in the first degree." RP (Nov. 12, 2021) at 510.

V. SENTENCING

There were two sentencing hearings, which were conducted by video conference. Stone and his counsel participated in the hearings from different locations.

The trial court sentenced Stone, as a persistent offender, to life without the possibility of release on both convictions. The trial court found that Stone was indigent under RCW 10.101.010(3)(c) and imposed the $500 VPA, $200 criminal filing fee, and $250 jury demand fee.

Stone appeals.

ANALYSIS

I. DOUBLE JEOPARDY

Stone argues that his convictions for attempted first degree murder and first degree arson violate double jeopardy. The State argues that the convictions do not violate double jeopardy because they have independent purposes and effects. We agree with the State.

We review double jeopardy claims de novo. *State v. Arndt*, 194 Wn.2d 784, 815, 453 P.3d 696 (2019). The double jeopardy clauses in the state and federal constitutions prevent the State from imposing multiple punishments for the same offense, among other things. *State v. Heng*, 22 Wn. App. 2d 717, 730, 512 P.3d 942 (2022), *review granted in part*, 200 Wn.2d 1025, (2023), *and aff'd*, 2 Wn.3d 384 (2023). To that end, the sentencing court is constrained "'from prescribing greater punishment than the legislature intended.'" *Id.* (internal quotation marks omitted) (quoting *State v. Muhammad*, 194 Wn.2d 577, 616, 451 P.3d 1060 (2019)).

To review a multiple punishments for the same offense double jeopardy claim, we determine whether the charged crimes constitute the same offense in light of legislative intent.

*Id*. at 730-31. Thus, the question before us is whether the legislature intended to allow the sentencing court to punish Stone for attempted first degree murder and the underlying arson.

We follow a four-step analytical process "to determine whether the legislature intended to authorize cumulative punishment." *Id*. at 731. "If legislative intent to allow separate punishments can be found in any of the four steps of the analysis, then there is no double jeopardy violation." *Id*. at 732. The four steps are as follows: "(1) consideration of any express or implicit legislative intent, (2) application of the *Blockburger*, or 'same evidence,' test, (3) application of the 'merger doctrine,' and (4) consideration of any independent purpose or effect that would allow punishment as a separate offense." *Arndt*, 194 Wn.2d at 816 (footnote omitted) (quoting *State v. Freeman*, 153 Wn.2d 765, 771-73, 108 P.3d 753 (2005)).

The State appears to concede that the first three steps are not dispositive of legislative intent allowing for multiple punishments for the two charges. But the State contends that attempted first degree murder had an independent purpose and effect from the first degree arson, and so, the offenses should not merge. We begin our analysis there.

"'To establish an independent purpose or effect of a particular crime, that crime must injure the person or property of the victim or others in a separate and distinct manner from the crime for which it also serves as an element.'" *Id*. at 819 (quoting *State v. Harris*, 167 Wn. App. 340, 355, 272 P.3d 299 (2012)). In *Arndt*, our Supreme Court affirmed Arndt's convictions for aggravated first degree murder with a first degree arson aggravator and first degree arson under the independent purposes and effects exception to the merger doctrine based on two grounds. *Id*. at 815. First, the court provided the following factual analysis:

> Arndt was charged with aggravated first degree murder for the death of a single victim, Darcy Veeder Jr. In contrast, her conviction for first degree arson, in

addition to resulting in the death of Veeder, also destroyed the O'Neils' home and was "manifestly dangerous" to the other occupants: O'Neil, Thomas, Kriefels, and the minor children. *See* RCW 9A.48.020(1)(a). Indeed, the arson charge included a separate aggravator for impact on persons other than the victim. CP at 354-55. The presence of additional victims places this case inside the "independent effect" exception to the merger doctrine that allows for the imposition of separate punishments.

*Id*. at 819.[6]

Second, the court reasoned that the charged crimes have separate purposes because the arson statute, located in chapter 9A.48 RCW, is intended to protect property, whereas the "aggravated murder statute . . . found in two different chapters . . . , chapter 9A.32 RCW (Homicide) and chapter 10.95 RCW (Capital punishment—Aggravated first degree murder)," is intended to protect human life.[7] *Id*. at 820.

In *Heng*, Division One analyzed whether felony murder predicated on arson and the underlying arson had independent purposes and effects such that it would allow punishment as separate offenses. 22 Wn. App. 2d at 731. Division One, relying on *Arndt*, concluded that the charges had independent purposes and effects because (1) on an abstract level, the chapter of the RCW containing felony murder is dedicated to protecting human life whereas the chapter of the RCW containing arson is primarily dedicated to protecting property, and (2) while Heng's

---

[6] In *Arndt*, Arndt set fire to a house with eight people in it and only one person failed to escape. 194 Wn.2d at 790.

[7] Stone appears to argue that our Supreme Court erred by concluding that an independent purpose exists on an abstract level. Whatever the wisdom of Stone's argument, "[w]e are bound to follow majority opinions of our Supreme Court." *In re Pers. Restraint of Le*, 122 Wn. App. 816, 820, 95 P.3d 1254 (2004), *aff'd*, 155 Wn.2d 356 (2005). We also note that Stone makes much of *In re Pers. Restraint of Orange* but that case does not even discuss the independent purpose and effects analysis. 152 Wn.2d 795, 100 P.3d 291 (2004).

murder resulted in the death of one victim, the arson had other "victims," including the owners of the building in which the arson occurred "and the owners of the other businesses that were destroyed by the fire." *Id*. at 733-34.

*Heng* and *Arndt* control the outcome of this case. The attempted first degree murder statute is predicated on the crime of first degree murder found in chapter 9A.32 RCW, which is a chapter intended to protect human life.[8] *Arndt*, 194 Wn.2d at 820. And the arson statute is codified in a chapter 9A.48 RCW, which is intended to protect property. *Id*. Thus, on an abstract level, the offenses have a separate purpose.

The facts also support the application of this exception. Stone was charged with attempted first degree murder for attempting to cause death by the burning of one victim, Kedalo. In contrast, his conviction for first degree arson, in addition to resulting in the serious burning of Kedalo, destroyed the car Kedalo was in, and was "manifestly dangerous to any human life" for the other individuals in the proximity because the fire occurred at an open gas station and because car fires produce highly toxic fumes. RCW 9A.48.020(1)(a). To that end, the State elicited testimony about a fire fighter's concerns regarding the proximity of the fire to the gas pumps and regarding the toxic fumes. And in closing, the State argued "You don't go to a [gas station] with kids and people and couples and pets and throw gasoline on a vehicle in the middle of that gas station . . . and light it on fire and think that's not arson in the first degree." RP (Nov. 12, 2021) at 510.

Under these circumstances, the independent purposes and effects exception applies and Stone's double jeopardy claim fails.

---

[8] Criminal attempt is codified in RCW 9A.28.020.

## II. RIGHT TO CONFER WITH COUNSEL

Stone argues that his right to privately confer with counsel was violated at all critical stages of the pretrial proceedings and sentencing because Stone could not meaningfully exercise his right to confer during the video proceedings under the circumstances. The State argues that Stone failed to show that the alleged error constituted a manifest constitutional error under RAP 2.5(a). We conclude that even if that right was violated, it was harmless beyond a reasonable doubt.

The federal and state constitutions confer criminal defendants the right to "assistance of counsel at 'critical stages' in the litigation." *Bragg v. State*, 28 Wn. App. 2d 497, 503, 536 P.3d 1176 (2023) (quoting *State v. Heddrick*, 166 Wn.2d 898, 909, 215 P.3d 201 (2009)).

The right to assistance of counsel entitles the criminal defendant to the right to confer with counsel, including reasonable time for consultation with their counsel through private continual discussions. *Id*. at 504. Such consultation must be meaningful—not seamless. *Id*. We engage in a two-part fact specific inquiry when evaluating right to counsel claims: "(1) whether the constitutional error is manifest and (2) whether the violation prejudiced the defendant." *Id*. If the defendant shows that the deprivation of the right to counsel is manifest under RAP 2.5(a)(3), the right to counsel claim may be raised for the first time on appeal. *Id*.

A.      *Critical Stages in the Proceedings*

Stone identifies the bail setting, speedy trial, and sentencing hearings as critical stages in the proceedings.[9]  The State argues that the pretrial hearings did not constitute critical stages of the proceedings, but agrees that the sentencing hearing did.

Because the parties agree that the sentencing hearing was a critical stage in the proceeding, we analyze only whether the bail settings and speedy trial waiver were critical stages in the proceedings.

"A 'critical stage' is one 'in which a defendant's rights may be lost, defenses waived, privileges claimed or waived, or in which the outcome of the case is otherwise substantially affected.'"  *Id.* at 503-04 (internal quotation marks omitted) (quoting *Heddrick*, 166 Wn.2d at 910); *Heng*, 2 Wn.3d at 394-95 (holding that a bail setting hearing was not a critical stage under the circumstances).

A speedy trial waiver hearing is a critical stage in the proceedings.  *State v. Lackey*, 153 Wn. App. 791, 802, 223 P.3d 1215 (2009).

At the first appearance, Stone's counsel appeared to request that the bail issue be dealt with at a later hearing.  The trial court set bail at two and a half million dollars for the relevant charges.  Stone did not lose the ability to challenge bail.  Indeed, Stone later moved to lower bail.

---

[9] Stone also appears to broadly argue that his right to confer with counsel was violated at all critical stages of the pretrial proceedings.  Besides the aforementioned hearings, Stone is not specific as to which pretrial hearings he believes constitute critical stages in the proceedings. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."  *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).  We decline to analyze whether each pretrial proceeding, not otherwise addressed above, constituted a critical stage in the proceeding based on such passing treatment of the issue.

Stone did not lose rights, waive defenses, nor waive privileges at the hearing. We hold that Stone's bail setting hearing was not a critical stage.

In contrast, under *Lackey*, Stone's speedy trial waiver hearing constituted a critical stage in the proceedings. 153 Wn. App. at 802.

B.      *Structural Error*

Stone argues that automatic reversal is required without a showing of prejudice due to the interference with his right to continuously consult with counsel. Stone relies on *State v. Ulestad*, 127 Wn. App. 209, 111 P.3d 276 (2005). We disagree.

Deprivation of counsel at a critical stage is structural error warranting automatic reversal. *Heng*, 2 Wn.3d at 392. In *Ulestad*, we recognized that the structural error analysis applies to interferences with the related right to confer with counsel: "except for a limited right to control attorney-client communication when the defendant is testifying, any interference with the defendant's right to continuously consult with his counsel during trial is reversible error without a showing of prejudice." 127 Wn. App. at 214-15. Recently, we held that when a defendant has counsel, the deprivation of the right to meaningfully and privately confer together does not trigger structural error; rather, *complete* denial of counsel at a critical stage of the proceeding triggers structural error. *State v. Dimas*, __ Wn. App. __, 544 P.3d 597, 600-01 (2024)[10]. When the deprivation is with the defendant's right to confer with counsel, we apply the constitutional harmless error analysis. *Id*.

We follow *Dimas*, our more recent opinion, on whether structural error applies to interferences with the right to confer. In *Dimas*, "Dimas appeared at all pretrial hearings from a

---

[10] https://www.courts.wa.gov/opinions/pdf/D2%2057528-1-II%20Published%20Opinion.pdf

booth at the jail, while his defense counsel either was present in court or appeared remotely over Zoom." *Id.* at 598. Stone and his defense counsel appeared at the challenged hearings in this case from different locations, like in *Dimas*.

Here, Stone had the benefit of counsel. The present case does not involve a complete deprivation of counsel, but an alleged interference with the right to consult with counsel, which does not trigger structural error. *Id.* at 600-01.

C.      *Constitutional Harmless Error*

Depending on the nature of a virtual proceeding, a violation of the right to confer with counsel may occur if the trial court did not provide guidance to the criminal defendant about how to confer privately with counsel or if the trial court placed an unreasonable expectation on the criminal defendant to assert their rights. *Bragg* at 1181-83. Assuming, without deciding, that the trial court violated Stone's constitutional right to confer with counsel at the speedy trial hearing and at sentencing and that those violations were manifest error, we analyze whether those violations were harmless beyond a reasonable doubt.

To determine if reversal is required, "we presume prejudice, and the State bears the burden of proving harmlessness beyond a reasonable doubt." *Id*. at 1184. "Under constitutional harmless error analysis, the court will reverse unless it is persuaded beyond a reasonable doubt that the error did not contribute to the verdict." *Heng*, 2 Wn.3d at 395.

Here, any error was harmless. First, Stone and his counsel signed a speedy trial waiver before attending the hearing where his counsel presented that waiver to the trial court with an agreed continuance request. That waiver contained an affirmation that Stone had been informed

16

of his speedy trial rights. Any error related to the speedy trial waiver is harmless beyond a reasonable doubt.

Second, we evaluate the prejudice stemming from any infringement on Stone's right to confer with counsel at sentencing. Generally, "a persistent offender shall be sentenced to a term of total confinement for life without the possibility of release." RCW 9.94A.570. The application of RCW 9.94A.570 is mandatory. *State v. Ritchie*, 24 Wn. App. 2d 618, 648, 520 P.3d 1105 (2022), *review denied*, 526 P.3d 851 (2023). Here, the trial court sentenced Stone as a persistent offender. Stone acknowledges this. Additional attorney-client conferral would not have changed the outcome of Stone's sentencing.

More generally, contemporaneous attorney-client consultation would not have affected any of the aforementioned hearings. Under these circumstances, we hold that the State showed the alleged errors were harmless beyond a reasonable doubt.

### III. PROSECUTORIAL MISCONDUCT

Stone argues that the State committed prosecutorial misconduct by (1) asking Detective Chamblee to comment on a witness's veracity, (2) accusing Crowell of lying during cross-examination, and (3) arguing that the jury had to conclude that Nelson perjured himself to believe Crowell. We disagree.

Prosecutorial misconduct may deprive the criminal defendant of their constitutional right to a fair trial. *State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021), *review denied*, 198 Wn.2d 1041 (2022). We review prosecutorial misconduct allegations "'in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury.'" *Id*. (quoting *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018)).

Where the defendant fails to object to the alleged misconduct below, the

defendant waives the prosecutorial misconduct claim unless the defendant shows (1) that comments were improper, (2) that the prosecutor's comments were both flagrant and ill-intentioned, (3) that the effect of the improper comments could not have been obviated by a curative instruction, and (4) a substantial likelihood the misconduct affected the verdict.

*Id*. at 201.

In evaluating unpreserved prosecutorial misconduct claims, we focus on whether the resulting prejudice could have been cured. *Id*.

Stone did not object to any of the challenged conduct, and so, he must meet the aforementioned burden.

A.       *Witness Examination*

i. *Detective Chamblee*

The State elicited from Detective Chamblee that Nelson was the only witness that voluntarily reached out to him, and Crowell did not contact him. Stone did not object. On appeal, Stone argues that this constituted eliciting improper vouching testimony. We disagree.

"Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Relatedly, the prosecutor may not engage in indirect vouching by eliciting testimony from a police officer about the credibility of a crucial defense witness. *State v. Cook*, 17 Wn. App. 2d 96, 106, 484 P.3d 13 (2021). "It is misconduct for the prosecutor to ask a witness whether he or she believes another witness is telling the truth or lying." *Id*.

In *Cook*, Division Three held that the prosecutor engaged in improper conduct under the following circumstances:

> In response to the prosecutor's question, the detective testified that if he thinks someone is making a false report, he will include this in his report and also speak to the prosecutor about it. The prosecutor then asked the detective whether he did that here. The detective answered that he did not. The questions and answers clearly implied that Detective Scott thought Cook's accusers were reporting the truth.

*Id*. at 106-07.

In *State v. Hawkins*, Division One concluded that it was improper for the State's to elicit that an officer would not arrest someone if they didn't believe the reporting party was credible; it was improper because it implied that the officer believed they had a credible witness. 14 Wn. App. 2d 182, 190, 469 P.3d 1179 (2020).

Here, the State's questioning emphasized how the defense witness Crowell did not contact the detective, but other willing witnesses had contacted the State in a roundabout way, and Nelson, one of the State's key identification witnesses, voluntarily came to the detective. This line of questioning is distinguishable from the aforementioned cases. While the State attempted to draw a distinction between Crowell and its own witness about their willingness to approach law enforcement, this testimony did not clearly imply that Detective Chamblee had an opinion on Crowell's credibility. Indeed, the detective testified, "I haven't been contacted by anybody willingly in this case." RP (Nov. 10, 2021) at 422. Under these circumstances, we hold that the prosecutor's line of questioning was not improper. And even assuming that line of questioning was improper, a curative instruction that admonished the members of the jury that they are the sole judge of credibility could have obviated any prejudicial effect.

ii. *Crowell*

Stone argues that the State committed flagrant and ill-intentioned misconduct on cross-examination of Crowell as "the prosecutor explicitly called Crowell a liar." Br. of Appellant at 45. We disagree.

"Cross examination designed to compel a witness to express an opinion as to whether other witnesses were lying constitutes misconduct." *State v. Stover*, 67 Wn. App. 228, 230, 834 P.2d 671 (1992). More generally, it is improper conduct "for a prosecutor to express a personal opinion as to the credibility of a witness." *State v. Lindsay*, 180 Wn.2d 423, 437, 326 P.3d 125 (2014). But "[w]here a prosecutor shows that other evidence contradicts a defendant's testimony, the prosecutor may argue that the defendant is lying." *State v. McKenzie*, 157 Wn.2d 44, 59, 134 P.3d 221 (2006).

In *Lindsay*, the prosecutor, in closing argument, characterized the defendant's testimony as "'funny,' 'disgusting,' 'comical' and 'the most ridiculous thing I've ever heard.'" 180 Wn.2d at 429. The prosecutor described the defendant's theory of the case as "'a crock,'" and "told the jury that [the defendant] should not 'get up here and sit here and lie.'" *Id*. Our Supreme Court held that the prosecutor impermissibly expressed his opinion as to the personal credibility of the defendant given the interplay between the aforementioned comments. *Id.* at 438.

Here, Crowell testified on direct that Stone was in the store when Kedalo hit Bersoza's bicycle and then he came running out to defend Bersoza. On cross-examination, Crowell testified that Stone wasn't initially involved in the conflict, and seemingly, that Stone did not hit Kedalo. The State played an earlier recording from Crowell's interview with the defense investigator wherein Crowell admitted that Stone hit Kedalo.

20

The following exchange ensued:

Q.    And now when you have this interview, you're talking about Rick actually not being in the store but actually hitting -- hitting -- you said he hit this guy. So which is it? Were you lying then in this interview, or are you lying to these jurors today? Which day were you not telling the truth? Just tell us which day.

A.    Well, I'm not lying to you. It's the way he's worded it to me. The first conversation about Rick not hitting the guy, he asked is he in a fight with him. At that point he was not. He was still in the store when the fight started. It was [Bersoza] and the guy. And then [Stone] came out of the store. It's the way the man is questioning me.

Q.    Fair enough.

RP (Nov. 10, 2021) at 455-56.

The State did not ask Crowell to express an opinion as to whether *other* witnesses were lying. Instead, on cross-examination the State asked Crowell about her own testimony that seemed to contradict her prior recorded statements. And the prosecutor's question in cross examination is clearly distinguishable from *Lindsay*, which involved several comments by the prosecutor in closing argument that amounted to an opinion expressed on the personal credibility of a witness. The prosecutor's questions here did not generally characterize Crowell as a liar, nor did the prosecutor state that Crowell's testimony was generally incredible. Instead, the prosecutor's question accused Crowell of at some point lying about Stone's location during an earlier altercation with Kedalo based on inconsistencies in Crowell's testimony and prior statement. Additionally, when Crowell disagreed with the prosecutor's use of the word "lying" and explained the discrepancy, the prosecutor acknowledged the explanation with "fair enough." RP (Nov. 10, 2021) at 455-56.

The cases that Stone cites do not show that the State's question was improper in this context. And more generally, the State had a responsibility to explore the inconsistency between

21

Crowell's prior recorded statement and her testimony. We hold that the State's question was not improper.

And even assuming that the question was improper under the circumstances, this question was not about Stone's alibi—whether Stone was at the gas station or Crowell's home when the arson occurred. Instead, the challenged question was about where Stone was located during the incident with the bicycle, which was sometime prior to the arson. Crowell established Stone's alibi, and the State did not accuse Crowell of lying regarding the alibi. And so, in the context of the entire trial, we conclude that a curative instruction could have obviated the prejudicial effect and the prosecutor's question did not have a substantial likelihood of affecting the verdict.

B.      *Closing*

Stone argues that the State committed flagrant and ill-intentioned misconduct in closing by arguing that either Crowell or Nelson perjured themselves because they both cannot be right. Specifically, Stone contends the State shifted the burden of proof by arguing in closing that the jury must find that Nelson, the State's witness, lied to believe Crowell's alibi for Stone. We disagree.

"Although prosecutors have 'wide latitude' to make inferences about witness credibility, it is flagrant misconduct to shift the burden of proof to the defendant." *State v. Miles*, 139 Wn. App. 879, 890, 162 P.3d 1169 (2007) (quoting *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). In *Miles*, the prosecutor emphasized the "'mutually exclusive' versions of events" from the State and the defense. *Id*. at 889. The prosecutor went on to say,

> "[I]n this case you have no choice because you have two conflicting versions of events. One is not being candid with you. . . . You are being asked to use your experience and your common sense to decide which version of events that you have heard over in this courtroom over the course of this trial is more credible."

22

*Id*. at 890. We held that "to the extent the prosecutor's argument presented the jurors with a false choice, that they could find [the defendant] not guilty only if they believed his evidence, it was misconduct." *Id*. We reasoned that the jurors could have disbelieved the defendant's theory, but still acquitted because they were not satisfied that the State had met its burden. *Id*.

> In *State v. Fleming*, the prosecutor, in closing, argued,
>
> "*for you to find the defendants . . . not guilty of the crime of rape in the second degree,* with which each of them have been charged, based on the unequivocal testimony of [D.S.] . . . , *you would have to find either that [D.S.] has lied about what occurred in that bedroom or that she was confused; essentially that she fantasized what occurred back in that bedroom.*"

83 Wn. App. 209, 213, 921 P.2d 1076 (1996). Stating that such "argument misstated the law and misrepresented both the role of the jury and the burden of proof," Division One concluded that this argument constituted a "flagrant and ill-intentioned violation of the rules governing a prosecutor's conduct at trial." *Id*. at 214. In that case, the improper conduct did not occur in isolation, but the prosecution also argued "there was no reasonable doubt because there was no evidence that the witness was lying or confused, and if there had been any such evidence, the defendants would have presented it." *Id*.

And in *State v. Wheless*, the prosecutor argued that, to find the defendant not guilty, one would have to conclude that the police must have lied. 103 Wn. App. 749, 758, 14 P.3d 184 (2000). Division One held that the statement was improper, but not so flagrant and ill-intentioned that a curative instruction would not have obviated the resulting prejudice. *Id*.

Here, the State's accusation of perjury in closing argument was improper, but the error is not reversible under these circumstances. This case is readily distinguishable from *Fleming* where the challenged misconduct was flagrant and ill-intentioned. The challenged conduct here

23

occurred in isolation. While there may have been an implication that Nelson lied, the prosecutor did not explicitly maintain that to find Stone not guilty, Nelson must have lied.

Under these circumstances, we conclude that a curative instruction could have obviated any resulting prejudice. We also conclude that Stone does not establish there was a substantial likelihood the prosecutor's misconduct affected the verdict when viewed in the context of the whole argument, the issues of the case, the evidence presented, and the instructions given to the jury. As such, Stone fails to meet his burden to overcome the waiver of this prosecutorial misconduct claim.[11]

C.      *Ineffective Assistance of Counsel*

Stone argues that his counsel was ineffective for failing to object to the prosecutorial misconduct and for not requesting a curative instruction. We disagree.

To prevail on an ineffective assistance of counsel claim, the defendant must show that their counsel's performance was objectively deficient and that such performance prejudiced them. *State v. Emery*, 174 Wn.2d 741, 755, 278 P.3d 653 (2012). In this context, "prejudice exists when a defendant shows that there is a reasonable probability that but for counsel's errors, the proceeding would have resulted differently." *In re Yates*, 177 Wn.2d 1, 35, 296 P.3d 872 (2013)

Generally, only defense counsel's failure to object to egregious misstatements in the prosecutor's closing argument will constitute deficient performance. *In re Pers. Restraint of*

---

[11] Stone argues that the cumulative effect of the alleged misconduct requires reversal. "[T]he cumulative effect of repetitive prosecutorial misconduct may be so flagrant that no instruction or series of instructions could erase their combined prejudicial effect." *Cook*, 17 Wn. App. 2d at 106. Because we hold only one of the challenged grounds for prosecutorial misconduct was improper, the cumulative effect analysis is not applicable here.

*Cross*, 180 Wn.2d 664, 721, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1 (2018). "If a prosecutor's remark is improper and prejudicial, failure to object may be deficient performance." *Id.*

We have agreed that the failure to object to the following prosecutorial statement in closing constituted deficient performance, "'Then you have the defendant. The manner in which he testified, the State believes, this prosecutor believes, that he got up there and lied.'" *State v. Horton*, 116 Wn. App. 909, 921, 68 P.3d 1145 (2003).

Assuming, without deciding, that Stone's counsel's failure to object and request a related curative instruction during closing argument was below the objective standard of reasonableness, Stone must show prejudice. But he fails to do so.

Stone's argument as to prejudice appears to be that because his counsel did not object to a remark that was improper and to some degree prejudicial, it was necessarily sufficiently prejudicial to warrant reversal under ineffective assistance of counsel. While we acknowledge that improper conduct necessarily results in some prejudice, we disagree that it is automatically sufficiently prejudicial to meet the ineffective assistance of counsel definition of prejudice— "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *In re Yates*, 177 Wn.2d at 36. To this point, Stone offers little argument. And in light of the evidence presented at trial discussed above, we conclude that Stone has failed to show that there is a reasonable probability that the result at trial would have been different.

## IV. RIGHT TO AN IMPARTIAL JURY

A.    *Race-Based Comments*

Stone argues that the trial court violated his right to a fair and impartial jury by not sua sponte striking the venire because Juror 32's race-based comments tainted the venire. The State argues that review is not warranted because Stone did not move to strike the venire and because Stone did not exercise all of his peremptory challenges under *Talbott*.[12] We determine review is not warranted under RAP 2.5(a).

i. *Failure to Exercise Peremptory Strikes does not Preclude Review.*

Seating a biased juror violates a criminal defendant's federal and state constitutional right to a fair and impartial jury. *State v. Irby*, 187 Wn. App. 183, 192-93, 347 P.3d 1103 (2015). "[I]f a party allows a juror to be seated and does not exhaust their peremptory challenges, then they cannot appeal on the basis that the juror should have been excused for cause." *State v. Talbott*, 200 Wn.2d 731, 747-48, 521 P.3d 948 (2022). This rule "encourages parties to cure jury-selection errors with their peremptory challenges." *Id.* at 738.

We conclude that failing to use remaining peremptory challenges to excuse members of the venire does not preclude a party from arguing that the venire should have been stricken on appeal. Because a party could never have enough peremptory challenges to excuse a tainted venire, the rule's underlying purpose to cure selection errors is not served by precluding review here. Thus, we find *Talbott* inapplicable under these circumstances.

---

[12] *State v. Talbott*, 200 Wn.2d 731, 747-48, 521 P.3d 948 (2022).

ii. *Stone Failed to Show Manifest Error*

Under RAP 2.5(a), we may refuse to review unpreserved errors. However, a party may raise an unpreserved error by showing it constitutes a "manifest error affecting a constitutional right." RAP 2.5(a)(3). To be manifest, the alleged constitutional error must be prejudicial, which occurs if it is plausible that it had practical and identifiable consequences at trial. *Irby*, 187 Wn. App. at 193.

Even absent an objection by the defense, the trial judge has an independent obligation to protect the right to a fair and impartial jury. *Id*. Because the seating of a biased juror is necessarily prejudicial, the criminal defendant may show the error is manifest by showing that the record demonstrates actual bias of a juror. *Id*.

Stone's challenge is of constitutional magnitude as it implicates the right to a fair and impartial jury. We next review if the error is manifest, or whether the record demonstrates actual bias of a juror.

"Challenges to the entire panel shall only be sustained for a material departure from the procedures prescribed by law for their selection."[13] CrR 6.4(a). Defense counsel is in the best position to question the venire about racial prejudice.[14] *State v. Davis*, 141 Wn.2d 798, 834, 10 P.3d 977 (2000).

---

[13] Stone does not argue that there has been a material departure from the jury selection process to warrant challenging the venire under CrR 6.4(a).

[14] In *State v. Guevara Diaz*, Division One has recognized that questioning of a juror's actual bias, under those circumstances, "should have occurred outside the hearing of other jurors because of defense counsel's viable concern over questioning potentially biased jurors in front of the jury pool." 11 Wn. App. 2d 843, 858, 456 P.3d 869 (2020).

A party claiming that actual bias supports striking a juror must establish actual bias with proof that shows more than the possibility of prejudice. *State v. Munzanreder*, 199 Wn. App. 162, 176, 398 P.3d 1160 (2017). Relevant facts regarding whether exposure to a fellow juror's remarks constitute sufficient proof of actual bias include the speaker's professed expertise about the topic and the repetition of the substance of the challenged statement. *State v. Strange*, 188 Wn. App. 679, 685-86, 354 P.3d 917 (2015).

Here, during voir dire, a juror connected the defendant's last name to being Native American. Then, the juror's comment connected being Native American with a negative generalization about child rearing. That juror was struck on other grounds. The struck juror did not have professed expertise on Native American culture and did not repeat the substance of the challenged comment.

Stone maintains that the venire should have been struck because of its exposure to the struck juror's isolated comment expressing bias as to Native Americans. But Stone does not provide proof that any individual juror had actual bias, much less that the venire had actual bias. Br. of Appellant at 66 ("A doubt persists whether the jury that tried Stone's case was impartial after hearing Juror 32's disparaging race-based comments about Native Americans.").

Stone has a valid concern about that comment raising the possibility of bias in the venire. But, under the circumstances, the possibility of racial bias stemming from this single comment does not warrant the trial court sua sponte striking the venire. We hold that Stone fails to show that his challenge constitutes manifest error.

B.      *Ineffective Assistance of Counsel*

Stone argues that his counsel was ineffective by not moving to strike the venire. We disagree.

To show ineffective assistance of counsel, the defendant must show deficient performance and prejudice. *Emery*, 174 Wn.2d at 755. We "strongly presume that counsel's representation was effective." *Id.* The defendant establishes prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *In re Yates*, 177 Wn.2d at 35.

Here, the allegedly biased juror was struck. As discussed above, there was not proof that any individual member of the venire had actual bias, much less the entire venire. Given the isolated nature of the comment and the lack of proof of actual bias, we decline to hold that counsel performs below an objective standard of reasonableness by failing to move to strike the venire because of the possibility of bias under the circumstances. Moreover, Stone does not establish that the one negative comment resulted in a reasonable probability that, but for counsel's failure to move to strike the venire, the proceeding would have resulted differently.

## V.  LIMITING INSTRUCTION

Stone argues that the trial court erred in giving a limiting instruction over his objection as it limited his right to control his defense. The State argues that Stone did not meaningfully object to the instruction, and thus, cannot challenge it on appeal. We hold Stone meaningfully objected, but his argument fails.

We first address whether Stone meaningfully objected such to preserve this issue for appeal. CrR 6.15(c) provides that each party shall have an opportunity to object to proposed jury

instructions outside the presence of the jury. It further provides, "[t]he party objecting shall state the reasons for the objection, specifying the number, paragraph, and particular part of the instruction to be given or refused." CrR 6.15(c). "Any objections to the instructions, as well as the grounds for the objections, must be put in the record to preserve review." *State v. Sublett*, 176 Wn.2d 58, 75-76, 292 P.3d 715 (2012).

Additionally, RAP 2.5(a) "encourages parties to make timely objections, gives the trial judge an opportunity to address an issue before it becomes an error on appeal, and promotes the important policies of economy and finality." *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015).

Stone argued that the limiting instruction about the theft of the safety jacket was not necessary after the close of evidence. The trial court read the proposed instruction, "The evidence that Cesar Leon's vehicle may have been broken into is admitted for a limited purpose of explaining the safety [jacket] and where it may have come from. The jury should not infer that the defendant was involved in any way with this prowl." RP (Nov. 10, 2021) at 478. Stone responded, "the Defense might want to infer that he was involved with the vehicle prowl. I mean, if I consider all the evidence, it might make sense that he was involved in a vehicle prowl rather than something else." RP (Nov. 10, 2021) at 478.

This is sufficient to preserve the issue for appeal. While Stone did not explicitly say "objection," his statement that the defense might want to infer his involvement with the vehicle prowl explicitly contradicts the proposed instruction that the jury may not do so. And that statement apprised the trial court of the nature of the error so that the court could address it.

Stone asserts giving the instruction over his objection violated his right to control his defense under the Sixth Amendment to the federal constitution. Specifically, Stone argues that because the evidence of the safety jacket was offered against him, it should have been his choice whether to receive a limiting instruction.

"'We review allegations of constitutional violations de novo.'" *State v. Lynch*, 178 Wn.2d 487, 491, 309 P.3d 482 (2013) (quoting *State v. Siers*, 174 Wn.2d 269, 273-74, 274 P.3d 358 (2012)). Among other things, the Sixth Amendment confers the right for criminal defendants to present a defense, which requires "deference to the defendant's strategic decisions." *State v. Coristine*, 177 Wn.2d 370, 375, 300 P.3d 400 (2013). "'[T]he primary focus must be on whether the defendant had a fair chance to present his case in his own way.'" *Coristine*, 177 Wn.2d at 376 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984)).

In *Coristine*, our Supreme Court held only, "[i]nstructing the jury to consider an affirmative defense over the defendant's objection interferes with the accused's right to present a chosen defense." *Id*. at 378. It reasoned as follows:

> An affirmative defense places a burden of proof on the defendant, thus shaping the defense by introducing elements it must prove. This process may influence a wide range of strategic trial decisions, such as who is called to testify, the questions asked on direct and cross-examination, and what arguments are made in summation.

*Id*.; *Lynch*, 178 Wn.2d 487 (holding that placing the affirmative defense of consent on Lynch over his objection violated his Sixth Amendment right to control his defense).

Stone argues that his case is like *Coristine* and *Lynch* in that the court's limiting instruction violated his right to present his defense. But, we do not find the facts or reasoning analogous because the limiting instruction here did not impose an affirmative defense on Stone.

31

The concerns about placing an unwanted burden of proof on the defendant are not present here like in *Coristine*. Stone fails to show how giving the limiting instruction over his objection rises to a similar level of strategic importance as giving an unwanted affirmative defense. Therefore, we conclude that giving the limiting instruction did not violate Stone's rights under the Sixth Amendment.[15]

## VI. CUMULATIVE ERROR

Stone argues that cumulative error violated his due process rights. We disagree.

The combined effect of errors, that individually may be harmless, may warrant a new trial if the combined effect "produce a trial that is fundamentally unfair." *Emery*, 174 Wn.2d at 766.

Here, as discussed above, contemporaneous attorney-client consultation would not have affected the speedy trial waiver hearing or sentencing. And the perjury argument the prosecutor made in closing was not flagrant and ill-intentioned. The prosecutor did not explicitly maintain that to find Stone not guilty, Nelson must have lied—though that may have been an implication. Under these circumstances, we conclude that the combined effect of the errors in this case did not produce a trial that was fundamentally unfair.

## VII. LFOs

Stone argues that we should remand for correction of scrivener's errors in imposing the jury demand fee and criminal filing fee. Stone also argues that we should strike the VPA based on recent legislative changes. The State concedes that we should remand for the trial court to

---

[15] Stone also appears to argue that the trial court violated his constitutional right to control his defense because ER 105 provides that limiting instructions should be given "'upon request.'" But ER 105 is not constitutional. And again, the trial court did not force an affirmative defense upon an unwilling defendant, like in *Coristine*.

No. 56586-2-II

strike the aforementioned LFOs. We accept the State's concession and remand for the trial court to strike the aforementioned LFOs.

CONCLUSION

We remand for the trial court to strike the jury demand fee, criminal filing fee, and the VPA fee. We otherwise affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_Che, J._
Che, J.

We concur:

_Glasgow, J_
Glasgow, P.J.

_Hull, JPT_
Hull, J.P.T.*

---

* Sitting in Division Two pursuant to RCW 2.06.040 by order of the Associate Chief Justice.

33